UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JON LUER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 4:17-CV-00767-NAB |
| | ) | |
| ST. LOUIS COUNTY, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by Defendants Michael Clinton, Benjamin Selz ("Officer Clinton" or "Officer Selz," respectively, or collectively, "Officers"), and St. Louis County, Missouri, (the "County"), (Doc. 64), and the Motion for Partial Summary Judgment filed by Jon Luer and Andrea Steinebach, ("Mr. Luer" and "Ms. Steinebach", respectively, or collectively, "Plaintiffs"). (Doc. 66). Also before the Court is Defendants' Motion to Strike Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs' Statement of Material Facts, and Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment. (Doc. 71). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 14). For the following reasons, the Court will grant Defendants' motion in part, deny Defendants' motion in part, and will grant Plaintiffs' motion in its entirety. Additionally, the Court will deny Defendants' Motion to Strike.

## I. FACTUAL BACKGROUND

On July 10, 2016, at approximately 3:00 a.m., Plaintiffs Jon Luer, Andrea Steinebach, and their son, Luca Vezin ("Luca") were asleep in their suburban St. Louis County home (the

"Luer-Steinebach home"). Mr. Luer and Ms. Steinebach were awakened by strange noises, including unfamiliar voices and banging. Because they were sleeping with their bedroom window open, they initially thought the noises must be coming from outside. Mr. Luer, clad only in the underwear in which he had been sleeping, left the bedroom to investigate the source of the noises. As he walked down the dark hallway outside his bedroom, he turned a corner and was confronted by two men with weapons drawn and flashlights pointing at him. The men identified themselves as police officers, and asked Mr. Luer whether he was armed, and whether there were weapons in the house. Mr. Luer told the officers that he was not armed, but that there were weapons in the home, as he was a collector and dealer of antique firearms. At that point, the officers, who were identified as Officers Clinton and Selz, holstered their weapons.

What follows is an account of how and why Officers Clinton and Selz found themselves walking through the Luer-Steinebach home in the middle of the night with their weapons drawn. At approximately 2:30 a.m. that same morning, an unidentified man rode in a taxi from downtown St. Louis City to St. Louis County. Upon arrival, the man, who was described by the taxi driver as highly intoxicated, asked to be dropped in the Luer-Steinebach neighborhood, and explained that he needed to go fetch some money to pay his fare. The man then ran off towards some houses, one of which was the Leur-Steinebach home, after which he never returned. Once the taxi driver realized that he had been stiffed on his fare, he called the St. Louis County Police to report the incident. Officers Clinton and Selz arrived on the scene an indeterminate amount of time later. The taxi driver told the Officers that a drunken man wearing a white hat had left without paying his fare, and indicated to the Officers in which direction the man had gone. Officer Clinton set off to find the scofflaw, and proceeded to walk between the two houses to the east of Plaintiffs' home, crossed the backyard of Plaintiffs' next-door neighbor, and finally

circled around and walked between the Luer-Steinebach home and that of their neighbors. Officer Clinton did not find anyone hiding in any of the areas searched. However, as he was walking between the Luer-Steinebach home and their neighbor's house, he "observed an unlocked pedestrian garage door."[1] After Officer Clinton observed the unlocked door, he and Officer Selz went to the front of the home and rang the doorbell twice, knocked on the door approximately three times, and knocked on windows approximately one to two times.[2] As the Officers walked around the exterior of the home, everything remained dark and quiet, and when no one answered the front door, the Officers unholstered their weapons and entered the garage. The Officers found the door leading from the garage to the home's interior likewise unlocked, and they entered the interior of the home. They noticed a light on in the basement, so they first went there, and finding no one, proceeded upstairs and continued to walk through the house, at which point they encountered Mr. Luer.

After Mr. Luer told them that he was the homeowner, the Officers holstered their weapons and asked Mr. Luer to rouse his son Luca. Luca joined them in the hallway, also clad only in the underwear in which he had been sleeping. At that time, the Officers asked both of them to put on some clothes and accompany them outside. Mr. Luer and Luca, as well as Ms. Steinebach, who had been waiting in her bedroom, all got dressed and went outside with the Officers. At that time, the taxi driver joined them in the Luer-Steinebach driveway, where he

---

[1] The pedestrian doorway into the Luer-Steinebach garage has an outer storm door and an interior solid door. Much is made by Plaintiffs and Defendants regarding the exact state of the pedestrian doors leading into the Luer-Steinebach garage, as well as the door from the garage into the interior of the home, regarding whether they were visibly unlocked, and whether they were ajar or not. The Defendants concede that it is "not material as to whether the house doors were ajar or just unlocked. . . . It is uncontroverted that the house doors were not locked." (Doc. 77 at 6). In any event, because Plaintiffs accept as true for purposes of summary judgment the Defendants' characterization of the doors, the Court will do the same. Therefore, facts regarding the doors as recited by the Court in its opinion are taken from the Defendants' Statement of Uncontroverted Material Facts. (Doc. 64-1).

[2] Plaintiffs dispute whether the Officers rang the doorbell or knocked. However, as with the facts concerning the doors discussed in footnote one, Plaintiffs accept as true Defendants' version of events for purposes of summary judgment, as will the Court. Therefore, the facts recited by the Court in connection with the Officers' attempts to rouse the occupants of the home by knocking or ringing the doorbell are taken from the Defendants' Statement of Uncontroverted Material Facts. (Doc. 64-1).

identified Luca as the person who had earlier failed to pay his fare. The Officers asked for permission to search Luca's bedroom for the white hat the taxi driver said was worn by his customer. The Luer-Steinebach family consented to the search, and the Officers did not find any white hat. The Officers asked Luca to submit to a sobriety test, which indicated that he was not intoxicated, after which the Officers concluded that Luca could not have been the person who failed to pay the cab driver.

Not surprisingly, the events of this night have had lingering effects on the Luer-Steinebach family. For example, after the incident concluded, Mr. Luer testified that he was shaken by the danger of the situation, particularly after he realized that he or his family members could have been killed. As he stated at his deposition, "If any shots had been fired in my direction, those that would not have hit me would have gone through that hollow wall into the bed where Luca was sleeping . . . there could have been two casualties that night and that really distressed me." (Doc. 67-2 at 48). Similarly, Ms. Steinebach testified that after the incident she experienced episodes of shock, trembling, and crying, she continues to feel insecure in her home, and she has trouble sleeping when home alone. (Doc. 75-2 at 26-30).

## II. PROCEDURAL BACKGROUND

On June 20, 2017, Plaintiffs filed their Second Amended Complaint against St. Louis County, Missouri, Officer Michael Clinton, and Officer Benjamin Selz. Plaintiffs bring two counts under 42 U.S.C. § 1983: Count I—Unlawful Entry and Search of Residence and Curtilage and Unreasonable Seizure (against Officers Clinton and Selz) and ; and Count III—Municipal Liability for Failure to Train or Supervise and for Warrantless Searches and Seizures Conducted Pursuant to Unconstitutional Policy or Custom (against St. Louis County). (Doc. 23). In their opposition to Defendants' Motion for Summary Judgment, Plaintiffs state that they will not

pursue any municipal liability claims based on a failure to train or supervise. Therefore, all such claims are dismissed, leaving only their municipal liability claims based on policy or custom. In Count I, Plaintiffs seek nominal, compensatory, and punitive damages against Defendants Clinton and Selz, as well as attorneys' fees and costs. In Count III, Plaintiffs seek nominal and compensatory damages against Defendant St. Louis County, and attorneys' fees and costs.[3]

Defendants filed the instant Motion for Summary Judgment on June 8, 2018. (Doc. 64). Also on June 8, 2018, Plaintiffs filed their Cross Motion for Partial Summary Judgment. (Doc. 66). The parties each filed Responses in Opposition to the Motions, as well as Replies. (Docs. 73, 75, 77, and 79). Lastly, on June 29, 2018, Defendants filed their Motion to Strike Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs' Statement of Material Facts, and Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment. (Doc. 71).

## III.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.* at 324. "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as

---

[3] Plaintiffs also brought one count—Count II—for Unreasonable Search and Seizure in violation of article I, section 15 of the Missouri Constitution. However, in their opposition to Defendants' Motion for Summary Judgment, Plaintiffs indicate that they are no longer pursuing their claim under the Missouri Constitution, so Count II of the Second Amended Complaint will be dismissed.

to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (internal quotations omitted).

## IV. DISCUSSION

### A. Plaintiffs' Motion for Partial Summary Judgment

The Court will turn first to Plaintiffs' Motion for Partial Summary Judgment, in which they assert that they are entitled to summary judgment on certain elements of their Fourth Amendment claims against Officers Selz and Clinton. Plaintiffs seek summary judgment on the following issues: (1) whether the Officers acted under color of state law at all relevant times; (2) whether the Officers had a warrant to enter either the curtilage of the Luer-Steinebach home or the interior of the home; (3) whether the Plaintiffs consented to the initial entry and search of the Luer-Steinebach home or its curtilage; (4) whether the Officers violated the Fourth Amendment when they entered the curtilage of the Luer-Steinebach home; and (5) whether the Officers violated the Fourth Amendment when they entered the interior of the Luer-Steinebach home. The Court will address each issue in turn.

Defendants admit that Officers Clinton and Selz were acting under color of state law at all relevant times, and that they did not have a warrant. Accordingly, the Court will grant summary judgment to Plaintiffs on these two issues. As to the issue of consent, Defendants dispute Plaintiffs' assertion that neither Mr. Luer nor Ms. Steinebach consented to the officers' initial entry into the curtilage or interior of their home. At the summary judgment stage, courts do not weigh the evidence and decide the truth of the matter, but rather determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). However, summary judgment is appropriate "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Scott*

*v. Harris*, 550 U.S. 372, 380 (2007). In such circumstances, the mere existence of some alleged factual dispute will not serve to defeat summary judgment; instead, the factual dispute must be "genuine." *Id*. In this instance, there is ample evidence in the record that no consent was given to the officers, and there is absolutely no evidence of record that consent was in fact provided.[4] Therefore, there is no "genuine" issue of material fact as to this matter, and the Court will grant summary judgment on this issue as well.

### i. Search of the Curtilage of the Luer-Steinebach Home

The Court will turn next to Plaintiffs' assertion that Officers Clinton and Selz violated their Fourth Amendment rights when they entered and searched the curtilage of their home without a warrant and without exigent circumstances. Defendants assert that the Officers did not violate Plaintiffs' constitutional rights because exigent circumstances existed that made the warrantless entry and search reasonable.

The Fourth Amendment guarantees to the people "the right . . . to be secure in their . . . houses . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. "In no quarter does the Fourth Amendment apply with greater force than in our homes, our most private space which, for centuries, has been regarded as 'entitled to special protection.'" *Kentucky v. King*, 563 U.S. 452, 474 (2011) (Ginsburg, J., dissenting) (quoting *Georgia v. Randolph*, 547 U.S. 103, 115, and n. 4). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569

---

[4]  For example, Officer Selz testified at his deposition that no resident of the Luer-Steinebach home gave either himself or Officer Clinton consent to enter their curtilage. *See* Doc. 67-3 at 93. Additionally, Mr. Luer testified at his deposition that he was asleep when the officers first entered his home, and that Ms. Steinebach and Luca were likewise asleep. *See* Doc. 67-2 at 27, 32-36. Finally, Defendants' disputation of this fact appears to be based on a misapprehension as to which entry into the curtilage and/or home the Plaintiffs are referring. Defendants cite to Mr. Luer's deposition testimony as proof that the officers did have consent to enter the curtilage. *See* Doc. 74 at 12. However, in the testimony to which Defendants cite, Mr. Luer was discussing the second entry into the home, during which he accompanied the officers back inside his home, and which occurred after everyone was awake and aware of what was happening. *See* Doc. 67-2 at 45.

U.S. 1, 6 (2013). "The Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). Additionally, this "firm line" of protection is not restricted to the interior of one's home; rather, it is well-established that the Fourth Amendment protections extend also to the curtilage surrounding the property. *United States v. Dunn*, 480 U.S. 294, 301 (1987). As noted by the Supreme Court, this right to be free from governmental intrusion in one's home "would be of little practical value if the State's agents could stand in a home's porch or side garden . . . with impugnity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Jardines*, 569 U.S. at 6. Thus, the area "immediately surrounding and associated with the home –what our cases call the curtilage" is regarded as "part of the home itself for Fourth Amendment purposes." *Id.*; *see also California v. Ciraolo*, 476 U.S. 207, 213 (1986) (the area around the home is "intimately linked to the home both physically and psychologically," and is where "privacy expectations are most heightened"); *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013) (same, citing *Jardines*).

It is a basic principle of Fourth Amendment Law, then, "that searches and seizures inside a home [or its curtilage] without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586; *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (warrantless entries into a home are, in the main, "*per se* unreasonable"). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Stuart*, 547 U.S. at 403. Exceptions to the warrant requirement, as the Supreme Court has explained, must be "few in number and carefully delineated." *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 318 (1972). The Supreme Court has recognized that exigencies that may justify a warrantless

search include situations where police are providing "emergency assistance to an injured occupant," where police officers are "in hot pursuit of a fleeing suspect," or where police need "to prevent the imminent destruction of evidence." *King*, 563 U.S. at 459.

The "exigent circumstances exception to the warrant requirement is narrowly drawn." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Whether an exigency existed must be assessed in light of the totality of the circumstances, and the inquiry is fact-intensive and made on a case-by-case basis. *United States v. Wihbey*, 75 F.3d 761, 765 (1st Cir. 1996). Additionally, the Eighth Circuit Court of Appeals has held that "an important factor to be considered in the exigent circumstances calculus is the seriousness of the offense." *Ball*, 90 F.3d at 263 (quotations omitted); *see also Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (rejecting misdemeanor offense as sufficient to justify a warrantless entry into a home, because the "gravity of the offense for which a person is arrested has a crucial bearing on whether circumstances were exigent enough to justify a warrantless home arrest, citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). The Government bears the burden of demonstrating that an exception to the warrant requirement applies, and that burden is "heavy" when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012) (quoting *Welsh*, 466 U.S. at 749-50). Such an urgent need "does not exist by mere supposition." *Id.*

In the instant case, Plaintiffs argue that they are entitled to summary judgment on the issue of whether the Officers' entry into the curtilage of their home violated their Fourth Amendment rights. The officers do not dispute that the area they entered was "curtilage" protected under the Fourth Amendment. They contend, however, that their entry was justified by exigent circumstances, or in the alternative, that they properly entered the property "based on an

implied license or implied consent."[5] (Doc. 73 at 11). It is not entirely clear which exigent circumstances Defendants maintain justified their entry into the Luer-Steinebach curtilage, but they cite to cases that discuss "hot pursuit" of fleeing suspects. They also state that because an accused thief had wandered between some homes and was not seen again, a "protective sweep" of the area was necessary. Therefore, the Court will explore whether their entry was justified by implied consent, hot pursuit, or the need for a protective sweep.

### a. Implied Consent

The Supreme Court has recognized that there exists an implied license permitting a visitor, including police officers or other state actors, "to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Complying with the terms of this implied consent "does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id*. The behavior of the officers in this case is so far removed from the social norms associated with the implied consent that allows a person to approach a home, knock, and promptly leave if not admitted, as to require no further analysis. The Officers did not have implied consent to enter and search the curtilage of the Luer-Steinebach home.

### b. Hot Pursuit

"Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." *King*, 563 U.S. at 459; *United Stated v. Schmidt*, 403 F.3d 1009, 1015 (8th Cir. 2005) ("Hot pursuit can, without more, justify a warrantless entry."). "In *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984), the Supreme Court instructed us to consider two factors in determining whether 'hot pursuit' creates an exigency: (1) the gravity of the underlying offense,

---

[5] They also argue that they are entitled to qualified immunity. The Court addresses Defendants' qualified immunity arguments in another section of this order, *infra*.

and (2) whether the government can demonstrate an 'immediate or continuous' pursuit of the suspect from the scene of the crime." *United States v. Anderson*, 688 F.3d 339, 344 (8th Cir. 2012).

The first factor, the gravity of the underlying offense, militates against any alleged "hot pursuit" creating an exigency in this case. The suspect was accused of failing to pay his cab fare of approximately $50-$65.00, which is either a misdemeanor or a mere ordinance violation.[6] Defendants attempt to make the alleged crime sound more serious, repeatedly referring to it as a "jailable" theft and describing the fare skipper as a "thief, facing a jailable offense." (Doc. 73 at 3, 4, 7). Defendants allege that failing to pay a fare is a violation of St. Louis County Ordinance §716.140, which prohibits taking anything of value, and which is subject to penalties of a fine of not more than $1,000.00, or imprisonment in the county jail for not more than one year, pursuant to St. Louis County Ordinance §716.180. The Court notes that Chapter 716 of the St. Louis County Ordinances, the Chapter at issue here, is entitled "Petty Offenses Code," and the Chapter also includes offenses such as Ticket Scalping (§716.215), Public Nuisance—Barking Dog (§716.075), Loitering (§716.080), and Playing a Radio on a Bus Without Earphones (§716.210), all of which are subject to the same potential penalties under §716.180. While these are technically, according to the applicable ordinance section, jailable offenses, the Court is not persuaded that the potential penalty changes the fact that these offenses are relatively minor infractions. Likewise, failing to pay a cab fare, while a clear violation of the ordinance, does not seem to the Court to be the sort of "serious offense" that may serve to create an exigency, as contemplated in *Welsh*. *Welsh,* 466 U.S. at 753.

---

[6] It is not clear whether the alleged crime would be a misdemeanor or an ordinance violation. Plaintiffs cite to Mo. Rev. Stat. §570.030 as applicable, which would classify the alleged theft as a class D misdemeanor. Defendants cite to St. Louis County Ordinance §716.140. an ordinance violation. The Court does not find the difference between the two significant, and makes no determination as to which is applicable.

Of course, the seriousness of the offense is not the only factor to consider. The Defendants must also demonstrate that there was an "immediate or continuous" pursuit of the suspect that justified the officers' entry into the curtilage of the Luer-Steinebach home. *Id*. By the time the officers arrived on the scene, the suspect was nowhere to be seen, and the taxi driver did not relay any information about his whereabouts other than the direction in which he had gone. The officers were not in "hot pursuit" of the suspect, as they never saw the accused, and there was no pursuit at all, let alone one that could be characterized as "immediate or continuous." Because the underlying offense was not serious, and there was no "immediate or continuous" pursuit of the suspect, the Officers' warrantless entry onto the curtilage was not justified by the "hot pursuit" exception to the warrant requirement.

c. Protective Sweep

To the extent that Defendants suggest that the warrantless entry may have been justified as a "protective sweep," that argument is likewise unavailing, for the reasons discussed below. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Anderson*, 688 F.3d 339, 346 (8th Cir. 2012) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). Such a sweep is permissible "if the searching officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. 325 at 327.

As an initial matter, the Court notes that no arrest occurred on the night at issue, and therefore any "protective sweep" could not have properly taken place "incident to arrest," per

*Buie. Id.* However, the inquiry does not necessarily end there, as the First, Second, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits have held that a protective sweep may be undertaken without an arrest, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances. *See United States v. Caraballo*, 595 F.3d 1214, 1224 (11th Cir. 2010) (gathering cases). The Court finds the reasoning of these cases persuasive, as it seems both fair and sensible to extend the protective sweep doctrine to cases where officers possess a reasonable suspicion that their safety, or the safety of others, is at risk, even in the absence of an arrest. Therefore, the Court will examine whether the alleged "protective sweep" at issue here may have been justified by a necessity to protect the safety of the persons present, even absent an arrest, because the Officers were lawfully on the property due to exigent circumstances.

In this case, Defendants Clinton and Selz argue that because a "thief" had "gone between two homes in the middle of the night and was not seen again," and a "citizen, a cab driver, was standing nearby along with the officers," a protective sweep of Plaintiffs' property was "objectively reasonable under these exigent circumstances." (Doc. 73 at 4). Nothing in Defendants' proffered argument clarifies for the Court precisely what sort of exigent circumstances Defendants are alleging existed. In an apparent attempt to create an exigency, Defendants, instead of offering specific, articulable facts that could justify a protective sweep, simply assert that "[a]ny suspect is potentially armed and/or a danger to others" and they were therefore justified in assuming the suspect was armed and posed a danger to those present. *Id.*

The Defendants have failed to point to any "specific and articulable" facts that would lead a reasonably prudent officer to believe that, at the time of the alleged "protective sweep," a sweep was necessary to protect the safety of those present. Really, all that was known to the Officers was that a drunken person had wandered off into the night without paying his cab fare.

Indeed, much of Defendants' argument as to why a sweep was needed for protective purposes is not based on any specific facts in the Officers' possession, but rather, is based on the lack of information in their possession. At the time of the alleged "protective sweep," no one had any idea whether the fare skipper was still in the vicinity. No one had reported, or even suggested, that the accused scofflaw was armed or dangerous, had harmed or threatened to harm anyone, or had otherwise behaved in a violent manner. Additionally, the alleged offense was not of a sort that would lead a reasonable officer to believe the suspect was likely to be armed and dangerous. *See Smith v. Kansas City*, 586 F.3d 576, 581 (8th Cir. 2009) ("the danger justifying a protective sweep comes from the possible presence of armed and dangerous persons in the vicinity") (citations omitted).

The Officers did not know a great many important details, and lacking such knowledge, acted on mere speculation about what may have occurred, or was currently occurring. Of course there could always be a dangerous person concealed in a yard, garage, home, or elsewhere, and the Officers did not and could not know *with certainty* that no dangerous person was hiding in the vicinity. But that, by itself, "cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*." *United States v. Carter*, 360 F.3d 1235, 1243 (10th Cir. 2004). Protective sweeps may not be carried out on the strength of an inchoate and unparticularized suspicion or hunch, as seems to have been the case here. *See Anderson*, 688 F.3d at 346 ("[s]omething more than a speculative hunch is required for police to conduct a protective sweep"). In the absence of specific and articulable facts that an individual, who posed a danger to the officers or others, was inside the particular place searched, the Officers' lack of information does not justify the warrantless sweep in this case, and their entry into the curtilage of the Luer-Steinebach home was unreasonable

under the Fourth Amendment. *See United States v. Custer*, 281 F.Supp.2d 1003, 1008 (D. Neb. 2003) ("lack of information cannot provide an articulable basis upon which to justify a protective sweep"); *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) (same).

For the reasons discussed above, Plaintiffs are entitled to summary judgment on the issue of whether Officers Clinton and Selz violated their Fourth Amendment rights when they entered their home's curtilage.

### ii. *Entry Into the Home*

As discussed above, warrantless home intrusions are "the chief evil against which . . . the Fourth Amendment is directed." *Payton*, 445 U.S. at 585. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id*. at 590. One exigent circumstance that may justify entry without a warrant is when the police "reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392. This is the exigency on which Defendants rely to excuse their warrantless entry of the Luer-Steinebach home. They assert that when they noticed the unlocked door, and then knocked and received no immediate response, they were reasonable in believing that they needed to enter to assist persons who may be seriously injured or were threatened with such injury. While courts have found warrantless entry justified on the basis of a suspected emergency need to render aid, the situation here differs from the cases on which Defendants rely: *Brigham City*, 547 U.S. 398, *Georgia v. Randolph*, 547 U.S. 103 (2006), and *Mincey*, 437 U.S. 385.

In *Brigham City*, the Supreme Court held that police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. *Brigham City*, 547 U.S. at 400. However, the

circumstances in *Brigham City* differ significantly from the situation confronting the Officers in the instant case. In *Brigham City*, police responded to a call about a loud party. *Id.* at 401. Upon arrival, they heard shouting, observed juveniles drinking beer in the yard, and saw through a screen door a fight taking place inside the kitchen, at which time the officers entered the home to intervene. *Id.* In the instant case, the Officers knew only that a person had failed to pay a cab fare and departed in the general direction of the Luer-Steinebach home. The situation confronting the Officers here was quite unlike that in *Brigham City*, where the officers had been informed that there was an ongoing incident at a specific home. Additionally in *Brigham City*, the officers heard someone shouting from inside the home "Get off me!" and "Stop, stop!" accompanied by "loud and tumultuous" noises, "thumping and crashing," and they witnessed a violent altercation with visibly bloodied participants inside the kitchen. *Id.* at 406. Here, by contrast, the Luer-Steinebach home was peaceful and dark, with no outward indications of ongoing violence or danger inside the home.

Defendant Officers also rely on *Mincey* to support their position that the entry to the home was lawful under the exigent circumstances exception, but this reliance is likewise misplaced. In *Mincey*, shots were fired inside an apartment during an undercover drug operation, and an officer was killed. *Mincey*, 437 U.S. at 387. After the shooting, officers quickly searched the apartment for additional victims, and discovered several wounded occupants. *Id.* at 388. Subsequently, officers conducted an extensive, warrantless search of the residence. *Id.* at 389. The Supreme Court held that although the initial search was constitutional under the emergency aid exception, the subsequent search was not. *Id.* at 392-93. The Court explained that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation . . . [and the subsequent search was not] justified by any emergency threatening life or limb." *Id.* at

393. *Mincey* does not support the Officers' actions here. In *Mincey*, unlike here, the officers knew a violent crime had just occurred inside the home. Here, the only known alleged crime occurred before the Officers arrived, it did not occur inside the home, and no violence or threat of violence was alleged.

*Randolph*, also relied on by Defendant Officers, was not about exigent circumstances at all; rather, the Supreme Court was confronted with a situation in which a husband and wife were both home, and the wife consented, over her husbands' protests, to the officers' entry and subsequent search of the residence. *Randolph*, 547 U.S. at 109. The Supreme Court held that the search was unreasonable because, although one resident consented, the other was physically present and expressly refused consent. The dissent in *Randolph* suggested that this holding could impede officers in protecting, for example, a spouse who called to report abuse at the hands of a domestic partner. *Id*. at 139. In response to that assertion, the majority in *Randolph* went on to state, in dicta, that it "would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur." *Id*. at 118. It is to this statement that Defendants point, saying that it would be likewise "silly" to assert that the Officers violated the Fourth Amendment rights of the Luer-Steinebach family, when they were merely entering their home to ensure their safety.

That may well be true if the Officers had a reasonable, articulable basis to believe the Luer-Steinebach family was in imminent danger of violence. However, as noted previously, the Officers had no reasonable basis to believe that the suspect was armed or dangerous or was inside the home. *See Brigham City*, 547 U.S. at 403 (the exigent circumstances exception "should govern only in genuine emergency situations"). The cab driver did not see, and never reported seeing, his customer enter the Luer-Steinebach home. The Officers here insist that the

unlocked storm door and open inner door indicated that the suspect had entered the home and was hiding. However, it was a pleasant summer evening, and many people leave their inner doors ajar so that the night air can enter through the outer storm door, and it would have been reasonable to assume that was the case in this instance. The Officers also attempt to justify their entry by pointing to the fact that they knocked and received no response. While it is true that nobody answered the door after the Officers knocked, there was simply no basis for believing that a lack of response indicated that someone was in danger inside the home. An equally plausible explanation would be that no one was home, or, as was actually true, that all the residents were asleep, as is commonly the case at three o'clock in the morning.

Furthermore, as discussed *supra*, "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense," and "a finding of exigent circumstances to justify a warrantless home entry should be severely restricted when only a minor offense has been committed." *Welsh*, 466 U.S. at 750 and 752. As the Court has already determined, the alleged offense at issue here is minor by any reasonable standard, and is not of the sort that would lead a reasonable person to assume that the suspect was likely armed and dangerous. In any event, it makes no difference whether the Officers actually believed, on the night in question, that the absconding customer was armed and dangerous and inside the home. The Eighth Circuit has long held that an objective, rather than subjective, standard is used to evaluate the reasonableness of an officer's belief that exigent circumstances existed. *See e.g., Root v. Gauper,* 438 F.2d 361, 364 (8th. Cir. 1971). The facts of this case simply would not have lead a reasonable officer to conclude that someone inside the home was in danger and in need of immediate aid.

The facts surrounding the Officers' warrantless entry into Plaintiffs' home are not dissimilar to those in *United States v. Selberg*, 630 F.2d 1292 (8th. Cir. 1980). In *Selberg*, a neighbor called the police to report that Selberg had left his home the day before, and the neighbor later noticed that the door to his home was open and he was concerned that this was indicative of a burglary. *Id*. at 1294. When officers arrived, they knocked, and, after receiving no response, they entered the home. *Id*. The district court found that exigent circumstances justified the officers' entry into Selberg's home, but the Eighth Circuit reversed. The Eighth Circuit found that the warrantless entry was "carried out under circumstances which did not objectively demonstrate any emergency threat to persons or property," as the officers knew only that the neighbor reported their suspicion of a burglary, and the door was open, but the home showed no signs of vandalism or other criminal activity, and the officers had "no reason to believe a crime had been or was being committed and that entry was necessary." *Id*. at 1297. The circumstances in *Selberg* would seem more likely to indicate the presence of exigent circumstances than in the instant case, since in *Selberg* the neighbor reported his concern that a burglary had occurred at a particular home, whereas here, no one had reported any concerns about criminal activity at the particular home the Officers entered, yet in *Selberg* the Eighth Circuit found no exigency justified the warrantless entry.

The present case is also somewhat similar to *United States v. Wells*, No. 1:09CR00130 SNLJ, 2010 WL 2520525 (E.D. Mo. June 14, 2010), *aff'd*, 648 F.3d 671 (8th Cir. 2011). In *Wells*, officers received a tip that Wells was manufacturing methamphetamine in the shed in his yard. An officer drove by his home and observed two open doors, one to a vehicle, and one to the shed, and proceeded to enter and search the premises without a warrant, asserting that to him the "open doors signified a burglary." *Id*. at 671-74. The district court rejected the officer's

argument, stating that "[t]he alleged exigency is based solely on the officers' observation of an open door to a vehicle . . . and a storage shed . . . which gave rise to his concern that a burglary may have been in progress," and that this "claim of exigent circumstances as an exception to the warrant requirement is simply too weak to pass constitutional muster." *Wells*. at *3.

Here, the Officers' argument regarding the existence of exigent circumstances is similarly "too weak to pass constitutional muster." *Id*. The Officers did not know whether the suspect was still in the vicinity, much less inside the Luer-Steinebach home, they had no reason to suspect he was armed and dangerous even if he was still in the area, and nothing about the home suggested that an emergency threat to persons or property existed. "[T]he ultimate inquiry under the Fourth Amendment is whether a search is reasonable, and that inquiry often turns on the degree of the intrusion on privacy." *Collins v. Virginia*, 138 S.Ct. 1663, 1683 (2018). The intrusion in this case, the Court believes, is emblematic of an invasion of privacy of the highest order. Police officers walked into a family's home in the middle of the night, and wandered through the house with their weapons drawn, until they eventually confronted the sleepy, underwear clad homeowner. Surely this sort of intrusion requires more compelling evidence of an exigent situation than existed here.

For the reasons discussed above, Plaintiffs are entitled to summary judgment on the issue of whether Officers Clinton and Selz's entry into the interior of their home violated their Fourth Amendment rights.

## B. Qualified Immunity

Officers Clinton and Selz argue that they are entitled to summary judgment on Count I on the basis of qualified immunity. Count I of Plaintiffs Amended Complaint contains two separate allegations: (1) that the Officers violated Plaintiffs' Fourth Amendment rights by entering the

curtilage and home of the Luer-Steinebach family without a warrant, consent, or exigent circumstances; and (2) that the Officers violated Plaintiff Luer's Fourth Amendment right against unreasonable seizure when they pointed their weapons at him inside his home.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known. The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. The qualified immunity analysis, thus, is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question. Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa* 137 S. Ct. 2003, 2007 (2017) (citations omitted). The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The Court uses a two-pronged test to resolve qualified immunity issues. First, "the court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232 (citations omitted). Second, "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (quotation marks and citations omitted). If either prong is not satisfied, qualified immunity applies. *Id.* The Court is free to address the two prongs in either order. *Id.* at 236. "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589, 2018 WL 491521, at *11 (Jan. 22,

2018). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001) (citation omitted).

As discussed above, the Court has already determined that Plaintiffs have not only alleged, but established, a violation of their constitutional right to be free from unreasonable searches of their home and its curtilage. Therefore, the only question remaining to be determined in deciding whether Officers Clinton and Selz are entitled to qualified immunity on this matter is whether the right at issue was clearly established at the time of the defendants' alleged misconduct. At the time of the events in this case, "a reasonable officer would have understood that it was unlawful to enter a home [or its curtilage] without a warrant, absent consent or exigent circumstances." *Smith v. Kansas City*, 586 F.3d 576, 581 (8th Cir. 2009); *see also Payton,* 445 U.S. at 586; *United States v. Poe*, 462 F.3d 997, 999 (8th Cir. 2006); *United States v. Powell*, 379 F.3d 520, 523 (8th Cir. 2004); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998). Therefore, qualified immunity will not operate to shield Officers Clinton and Selz from civil liability on this issue, and they are not entitled to summary judgment on Plaintiffs' claims that are based on unreasonable searches of their home and its curtilage under the Fourth Amendment.

The Court turns now to the Officers' assertion that they are entitled to qualified immunity on Plaintiff Luer's claim that they violated his constitutional right to be free from unreasonable seizure. To establish a violation of this right under 42 U.S.C. § 1983, Plaintiff must show that a seizure occurred and that it was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). The question of whether a seizure was unreasonable under the Fourth Amendment depends on whether it was objectively reasonable, judged from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Plaintiff Luer alleges that he was subjected to an unconstitutional seizure when Officers Clinton and Selz pointed their weapons at him for approximately fifteen seconds when he first encountered them in the hallway outside his bedroom.[7] Plaintiff cites to *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) as authority for the proposition that "pointing guns at persons who are compliant and present no danger is a constitutional violation." In *Baird*, the police were executing a search warrant in connection with the crime of altering a vehicle identification number. No one at the site of the search presented any resistance, yet, one of the officers detained several people for the two hours it took to complete the search, while pointing a submachine gun at them the entire time. The Court held that a seizure had clearly occurred, and that seizure was unreasonable under the Fourth Amendment because the officer pointed a gun at the citizens involved, even though there was no hint of danger from the citizens and the crime alleged did not suggest danger. *Baird*, 576 F.3d at 346. The Court agrees with Defendants, however, that this case is distinguishable from the situation here, as the citizens in *Baird* were held for hours at the point of a submachine gun, while Mr. Luer was confronted only briefly by officers with their weapons drawn.

Meanwhile, Defendants assert that what happened in the Luer-Steinebach home did not even constitute a seizure, because the Officers holstered their guns within fifteen seconds, and Mr. Luer was not subjected to physical force, nor did he submit to authority. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (seizure by policy requires either physical force or submission to assertion of authority of officers). Defendants point to *Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir. 1995) to support their contention that there was no seizure in this situation. In

_____
[7]  Officers Clinton and Selz assert that they never pointed their weapons at Plaintiff Luer, but instead at all times had them unholstered and pointing down at an approximately forty-five degree angle to the floor, in a position known to law enforcement officers as "low ready." However, the Court must take the non-movant Plaintiffs' version as true. *See Ricci v. DeStefano,* 557 U.S. 557, 586 (2009) ("On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party . . . if there a genuine dispute as to those facts.'").

that case, officers were pursuing a driver, Edwards, who had just crashed a stolen van and run away. When the officers caught up to Edwards, he was wearing only shorts and shoes and was clearly unarmed, and one officer briefly pointed his gun at Edwards before reholstering it. The Eighth Circuit Court of Appeals found that the officer pointing his gun at Edwards did not cause him to submit to the officer's authority, and therefore, Edwards was never seized and had "failed to show the violation of a constitutional right at all." *Id*. The Court notes that this case is also not directly on point, because while Edwards did not appear to pose a threat, he had been identified as a car thief and fled from the officers who investigated the crash.

The Court has been unable to identify any Eighth Circuit precedent addressing directly whether what happened here—pointing a gun at an individual, in and of itself—can violate the Fourth Amendment under some circumstances. However, case law from other circuits suggests that it can. *See Mlodzinski v. Lewis,* 648 F.3d 24, 38 (1st Cir. 2011) (pointing gun at unarmed woman who was not a suspect and who was not resisting, fleeing, or otherwise posing a threat violated Fourth Amendment; *Robinson v. Solano Cty.*,  278 F.3d 1007, 1013–15 (9th Cir. 2002) (en banc) (pointing a gun at an unarmed person who poses no danger violated Fourth Amendment); *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1192–93 (10th Cir. 2001) (pointing a gun at children after officer gained complete control of the situation "was not justified"). In any event, even if this was "clearly established" as a general rule, the rule's contours were not so well defined that it would be clear to a reasonable officer that the Defendants' conduct in the situation here was obviously unlawful.[8] As discussed above, immunity will issue if "officers of reasonable competence could disagree" on the lawfulness of the action. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, the Court concludes that Officers

---

[8]  Because the Court concludes that the parameters of the right Plaintiff Luer asserts were not clearly established at the time of the incident, it is not necessary to consider whether Plaintiff has definitively shown that his right to be free from unreasonable seizure was violated or not.

Clinton and Selz are entitled to summary judgment based on qualified immunity on Plaintiff Luer's Fourth Amendment unreasonable seizure claim.

### C.  Municipal Liability for St. Louis County

Plaintiffs, in Count III,[9] assert that their constitutional rights were violated as a result of policies or customs of St. Louis County pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Defendant County asserts that this claim is deficient because there is no evidence that the alleged violation of Plaintiffs' constitutional rights "resulted from a municipal custom or policy."

A "municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999). A "policy" is a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* A "custom" is an unofficial practice characterized by a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Id.* Plaintiffs allege that circumstances here suggest a custom by the St. Louis County police department of entering homes without a warrant or exigent circumstances whenever officers encounter homes with unsecured doors.

To establish municipal liability based on a custom, a plaintiff bears a "heavy burden" to demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials of the misconduct; and (3) that the plaintiff was injured by acts pursuant to the

---

[9]  Plaintiff also asserted in Count III a municipal liability claim based on a failure-to-train theory.  However, in their opposition to Defendants' Motion for Summary Judgment, Plaintiffs state that they "do not challenge Defendants motion for summary judgment with respect to their municipal liability claim based on a failure-to-train theory," so the Court will grant summary judgment to Defendants on that claim. (Doc. 75 at 13).

municipality's custom, meaning that the custom was the moving force behind the constitutional violation. *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (citing *Mettler*, 165 F.3d at 1200). Defendants argue that Plaintiffs have no evidence of any of the three factors.

In support of their municipal liability claim, Plaintiffs rely largely on the deposition testimony of Officers Clinton and Selz to show that St. Louis County police officers have a custom of frequently entering homes without a warrant or exigent circumstances in what they refer to as "open door calls." For example, at his deposition, Officer Selz testified that an "open door call" is "when somebody reports that there's an open door at a residence, they don't think anybody is home, possibly could have been burglarized." (Doc. 67-3 at 126). He went on to testify that this is a common thing in his experience at the department, and that he has participated in such searches approximately four or five times. Similarly, Officer Clinton was asked to speculate how often this type of search occurred during his three years at the St. Louis County police department, and he testified that it is "fairly common," and happened "possibly every—once or twice a—every couple weeks" and that he had participated in such searches on somewhere between twenty-five to one hundred occasions. (Doc. 67-4 at 97-98).

This testimony is suggestive of the existence of a police department custom that allows or even encourages officers to enter homes when there is a report of an open or unsecured door. However, suggestive is all that it is. There is absolutely no evidence in the record indicating whether any or all of these alleged "open door" searches were performed due to exigent circumstances, including burglaries or other crimes, health emergencies, or similar situations that would excuse the warrant requirement and render the search constitutional. Furthermore, this testimony, while evocative of the sort of improper custom alleged by Plaintiffs, is nothing more than mere speculation by two individual officers. They do not represent or speak for the St. Louis

County police department, and they were clearly simply offering their best guess as to how often such searches may occur. And, much like the record at large, their testimony is bereft of any indication concerning how often such searches may actually have been performed in the absence of exigent circumstances.

Plaintiffs, in a further attempt to show a widespread pattern of unconstitutional misconduct by Defendant County, point to an interoffice memorandum from 2011, produced by Defendants, and written by an investigator of the Bureau of Professional Standards. This memorandum states that when an officer "finds a residence unsecured it is their duty to determine the well-being of the residents and to determine if a possible crime had occurred." (Doc. 75 at 15; Doc. 76). This memorandum memorializes a conversation between a citizen and officer regarding a search undertaken by County officers when attempting to serve a protective order. The officers arrived at the apartment where they were to serve the order, and found the door open and the person to be served asleep on his sofa. The officers called out and tried to rouse him, but he was nonresponsive. The officers then entered the apartment to check on his well-being. The citizen subsequently filed a complaint with the Defendant County police department. However, the memorandum cited by Plaintiffs is nothing more than a Watch Commander's paraphrasing of a conversation between herself and the citizen. Doc. 76 at 14-15. There is no evidence of record that the author of the memorandum was actually articulating department policy or custom. Rather, she was merely describing a conversation regarding one isolated incident, during which it seems that exigent circumstances at least arguably existed.

Plaintiffs' evidence simply does not show a "continuing, widespread, persistent pattern" of unconstitutional misconduct by St. Louis County police officers. Other than the single incident at issue here, Plaintiffs present no evidence that St. Louis County police officers

regularly enter homes in the absence of exigent circumstances or other circumstances that would make such searches constitutionally permissible. Because the Court concludes that Plaintiffs fail to show a pattern of unconstitutional conduct, it need not explore whether Plaintiffs showed deliberate indifference to such alleged conduct by the municipality's policy-making officials, or whether the municipality's custom was the moving force behind the constitutional violation. *See Mick*, 883 F.3d at 1079.

Therefore, the undisputed evidence before the Court does not demonstrate that there was an unofficial custom or practice for St. Louis County police officers to enter citizens' homes without a warrant, consent, or the presence of exigent circumstances. The Court therefore grants summary judgment in favor of St. Louis County on Plaintiffs' §1983 municipal custom claim in Count III. Furthermore, as discussed *supra*, the Court is also granting summary judgment in favor of the County on Plaintiffs' failure-to-train municipal claim, as Plaintiffs do not oppose such judgment.

### D.  Motion to Strike

Finally before the Court is Defendants' Motion to Strike Plaintiffs' Motion for Partial Summary Judgment, the Memorandum in Support thereof, and its accompanying statement of material uncontroverted facts. Defendants assert that because Plaintiffs, in these documents, state that they dispute certain facts while nonetheless accepting the facts as true for purposes of summary judgment, their motion is non-compliant with Rule 56 of the Federal Rules of Civil Procedure and must be stricken.

Rule 12(f) of the Federal Rules of Civil Procedure provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A motion to strike is properly directed only to material contained

in pleadings." *Khamis v. Bd. of Regents, Se. Mo. State Univ.*, No. 1:09-CV-145-RWS, 2010 WL 1936228, at *1 (E.D. Mo. May 13, 2013) (quoting *Mecklenburg Farm, Inc. v. Anheuser-Busch, Inc.*, No. 4:07-CV-1719-CAS, 2008 WL 2518561, at *1 (E.D. Mo. June 19, 2008)). Rule 7(a) defines "pleadings" as a complaint, an answer to a complaint, an answer to a counterclaim, an answer to a crossclaim, a third-party complaint, and if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). Neither a motion for summary judgment, nor its accompanying memorandum in support, nor the attached statement of uncontroverted facts is a pleading, and courts in this district have generally not permitted parties to attack such non-pleadings through motions to strike. *See, e.g., Shea v. Peoples Nat. Bank*, No. 4;11-CV-1415-CAS, 2013 WL 74374, at *1 and *2, (E.D. Mo. Jan. 7, 2013) (citing cases); *Khamis*, 2010 WL 1936228, at *1 (the document attached to the memorandum in opposition "is not a pleading and cannot be attacked with a motion to strike"); *see also Milk Drivers Local Union No. 387 v. Roberts Dairy*, 219 F.R.D. 151, 152 (S.D. Iowa 2003) ("Pleadings include complaints, answers, replies to counterclaims, answer to cross-claims, third-party complaints, and third-party answers. Therefore, a motion to strike a motion for summary judgment is inappropriate and should be denied.") (internal citations omitted; collecting cases). Thus, the Court will deny Defendants' motion to strike Plaintiffs' Motion for Partial Summary Judgment and accompanying documents.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment on the following elements of Count I related to Unlawful Entry and Search: (1) the Officers acted under color of state law at all relevant times; (2) the Officers did not have a warrant to enter either the curtilage of the Luer-Steinebach home or the interior of the home; (3) Plaintiffs did not consent to the initial entry and search of the Luer-Steinebach home or its curtilage by Officers Clinton and

Selz; (4) the Officers violated the Fourth Amendment when they entered the curtilage of the Luer-Steinebach home; and (5) the Officers violated the Fourth Amendment when they entered the interior of the Luer-Steinebach home.

Defendant County is entitled to summary judgment on the claims of municipal liability based on failure-to-train and unconstitutional custom or policy. Defendant Officers are not entitled to summary judgment on the basis of qualified immunity on the issue of whether they violated Plaintiffs' Fourth Amendment rights when they entered the Luer-Steinebach home and its curtilage. The Defendant Officers are, however, entitled to summary judgment on the basis of qualified immunity on the issue of whether they violated Plaintiff Luer's Fourth Amendment right to be free from unreasonable seizure when they briefly pointed their weapons at him.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 66) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 64) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (Doc. 71) is **DENIED**.

**IT IS FINALLY ORDERED** that Count II of Plaintiffs' Second Amended Complaint, brought pursuant to the Missouri Constitution, is dismissed. The Court will issue a separate judgment consistent with this Memorandum and Order.

Dated this 19th day of November, 2018.


NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE